UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MEDIX STAFFING SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-225 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| NOVO HEALTH, LLC; NOVO HEALTH TECHNOLOGY GROUP, LLC; NOVO CONSERVATIVE CARE, LLC; NOVO DIRECT CONTRACTING, LLC; NOVO, LLC; INNOVATIVE ALLIANCE, LLC; and CURT KUBIAK; | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Medix Staffing Solutions, Inc. ("Medix") brings a three-count complaint [31] against Defendants Novo Health, LLC; Novo Health Technology Group, LLC; Novo Conservative Care, LLC; Novo Direct Contracting, LLC; Novo, LLC; Innovative Alliance, LLC; and Curt Kubiak. Medix alleges (1) breach of contract against all defendants; (2) account stated against all defendants; and (3) unjust enrichment against Defendant Curt Kubiak. Before the Court is Medix's motion [37] for summary judgment on all claims under Federal Rule of Civil Procedure 56. In response to Medix's motion, all defendants except for Novo Health, LLC request the Court grant summary judgment in their favor under Federal Rule of Civil Procedure 56(f)(1). For the following reasons, the Court grants in part and denies in part Medix's motion and denies Defendants' request under Rule 56(f)(1).

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

1

1. *The Parties*

Medix is a staffing company for businesses in the healthcare industry. All defendants aside from Curt Kubiak are related Wisconsin limited liability companies (the "corporate entities"), tied in some way to Novo Health, LLC.[1] Novo Health provides aggregated medical services. Kubiak has served as Novo Health's CEO since its formation in 2016. Novo Health Technology and Innovation Alliance are active passthrough entities and wholly owned subsidiaries of Novo Health. Novo Conservative Care, Novo, and Novo Direct Contracting are defunct, and Novo Health now owns their assets and contracts.

Defendants hired Medix as their only employee staffing company because they lacked the expertise in hiring personnel trained in a proprietary electronic medical record software called Epic. The exact services that Medix provided to Defendants, and which services Medix provided to which Defendants, is unclear in the record. The parties agree to the vague propositions that (1) Medix "is the only employee staffing company which Defendants have used" and (2) "Defendants engaged with [Medix] because Defendants lacked the expertise in hiring Epic Systems Corporation ("Epic") trained personnel." But neither party submits facts detailing more specific services.

2. *The Contracts*

Medix and Novo Health executed the contract at issue here and a related addendum on the same day, May 11, 2020. On that date, all named company defendants were Novo Health's subsidiaries or divisions, except for Novo. The contract and addendum were titled, respectively, "Epic Project Services Agreement" (the "Epic PSA") and "Addendum to the Service Agreement" (the "Addendum"). Both documents were prepared by Medix on Medix letterhead. Both were

---

[1] The Court will refer to the corporate entities without the "LLC" designation for the remainder of this opinion.

signed by Medix's director and Kubiak, whose title is listed as CEO of "Client." The opening paragraph in each document provides as follows:

> **Epic PSA:** This agreement for Epic project services (the "Agreement") is entered into as of the last date executed by the parties (the "Effective Date") by and between NOVO Health, LLC., a Wisconsin limited liability company, including its subsidiaries, divisions, and affiliates ("Client"), and Medix Staffing Solutions, Inc., an Illinois corporation, together with its division, Alidade Group ("Medix"), pursuant to the provisions of this Agreement.
>
> **The Addendum:** Medix Staffing Solutions, Inc., including its Alidade Group division ("Medix") and NOVO Health, LLC ("Client") (individually a "party" or collectively the "parties") entered into a Service Agreement as of 5/11/2020 for the provision of staffing services (the "Agreement"). The parties wish to execute this addendum in order to include terms and conditions for AlidadeDirect Epic training and assignment opportunities with Client ("Addendum"). In the event of any conflict between the terms in this Addendum and the terms in the Service Agreement, the terms in the Addendum shall apply. The effective date of this Addendum shall be the same as the effective date of the Service Agreement between Client and Medix.

The Epic PSA and the Addendum both provide a "Recitals" section. The Epic PSA defines "staffing services" broadly as Medix "placing Candidates or Contractors with Client," and includes a non-exhaustive list of "placement types." It then states that "Client desires to engage Medix for staffing services." The Addendum provides that "Client desires to engage Medix for staffing services to assist in its transition to an Epic healthcare software system … Medix agrees to provide Client with qualified Medix employees ("Contractors") for Client's Epic software transition project."

The Epic PSA also includes a merger clause, which states: "This Agreement, with applicable Addendum and Exhibit(s), constitutes the entire agreement between the parties, and there are no representations, warranties, covenants, or obligations except as set forth in this Agreement. This Agreement supersedes all prior and contemporaneous agreements … relating to any transaction contemplated by the parties to this Agreement."

3. *The Breach*

The parties agree on just about all terms of the relevant contract. The "Client" is required to pay Medix 30 days after the date of an invoice submitted by Medix and is subject to penalties for late

3

payment. Medix's invoices are fully payable by the "Client" unless they are disputed with written notice to Medix within 30 days. Medix sent regular and systematic weekly invoices to at least Novo Health from May 16, 2020 through December 25, 2021. No defendant submitted a timely written dispute of any invoice, and Kubiak confirmed that he was unaware of any dispute regarding Medix's services. Defendants further admit that the "Client" owed Medix $1,583,276.60 as of December 31, 2021. Kubiak testified that Defendants stopped making payments to Medix due to their inability to pay.

### 4. *Kubiak and the Companies*

Although Kubiak is the CEO of Novo Health, he is not the sole member of Novo Health. The parties dispute Novo Health's structure. Defendants cite Kubiak's affidavit submitted in support of Defendants' brief to assert that Novo Health has 20 members and four officers and directors. Medix cites Kubiak's deposition testimony to assert that there are 10 members of Novo Health and two officers. Novo Health has operated pursuant to an Operating Agreement since April 18, 2018. That Operating Agreement sets terms for the payment of Kubiak's salary.

Kubiak is Novo Health Technology's current registered agent and member. Novo Health Technology was originally created by Kubiak on February 21, 2020. At that time, Novo Health was listed as Novo Health Technology's registered agent. Novo Health, Novo Health Technology, and Kubiak's former employer all share the same address: 2105 E. Enterprise Ave., Appleton, WI 54913. Kubiak was also Novo's registered agent and member before Novo was administratively dissolved on December 13, 2020.

Novo Health Technology has been losing money since its inception. Kubiak estimates that it will break even if it can sell 300 Epic licenses, but its quota is capped at 50 licenses. Until it sells more licenses, Novo Health Technology will lose approximately $1 million per year. Novo Health Technology hopes to increase its number of licenses in part through labor supplied by Medix.

4

Innovation Alliance does not have its own employees. Instead, Innovation Alliance allegedly hires Novo Health to perform administrative services that an independent physician association requires to support its operations. Innovation Alliance has made intercompany loans to Novo Health, which Novo Health used to pay workers who were allegedly then leased to Novo Health Technology.

Defendants made intercompany loans to cover their expenses, including payroll, as the operating incomes of Novo Health and Novo Health Technology are insufficient to cover the companies' payrolls and debts. One such expense is Kubiak's salary. Kubiak is paid an annual salary of $240,000 in his role as CEO of Novo Health. Defendants have not paid dividends or made any distributions to their members, and they have no material hard assets or office space.

Novo Health has a Board of Managers, which meets at least annually. The parties dispute whether these meetings are substantive or related to financial matters. Kubiak claims, in his affidavit in support of his brief, that all of Novo Health's major financial decisions are approved by its Board of Managers. Medix disputes that the Board of Managers approves any such decisions, given the poor condition of the companies. In addition to the $1,583,276.60 balance the "Client" owes to Medix, Novo Health Technology owes a debt to Epic and Novo Health owes a debt to Settlers Bank.

Defendants contracted with an individual from another company for which Kubiak was CEO, Orthopedic and Sports Institute, for his services as a "finance director." That finance director, Aaron Bleier, was not an employee of any of the corporate entities. Kubiak oversaw Bleier's work. And although Kubiak did not know who instructed Bleier, he testified that Bleier was acting under instruction, rather than merely exercising his own independent decision-making.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1304 (7th Cir. 2022). "If the *moving* party will bear the burden of persuasion at trial," as here, "that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331, 329 (Brennan, J., dissenting but "not disagree[ing] with the [majority's] legal analysis").

"After giving notice and a reasonable time to respond," Fed. R. Civ. P. 56(f)(1), "courts may grant summary judgment for the non-moving party if all the requirements for a judgment are met. … But … no authority *requires* courts to do so." *Tatum v. Lucas*, No. 22-1069, 2022 WL 16844705, at *2 n.2 (7th Cir. Nov. 10, 2022), *cert. denied*, 143 S. Ct. 2619, 216 L. Ed. 2d 1214 (2023), *reh'g denied*, 144 S. Ct. 50, 216 L. Ed. 2d 1304 (2023).

**DISCUSSION**

*1. Breach of Contract*

To prove breach of contract under Illinois law, a plaintiff must show: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (citing *Association Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th

6

Cir. 2007), quoting *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6, 300 Ill.Dec. 601, 845 N.E.2d 22, 30 (2006)). Defendants concede that the Medix contract at issue was validly formed, that Medix performed its duties, that Novo Health breached its contract with Medix without a valid defense, and that Medix was harmed because it did not receive the money it was owed under the contract. Defendants also admit that there are no facts in the record to support their affirmative defenses of waiver, laches, accord and satisfaction, estoppel, or failure to mitigate damages. Defendants further concede that all corporate defendants aside from Novo Health are Novo Health "subsidiaries, divisions, [or] affiliates." Defendants dispute only that the corporate entities other than Novo Health are liable to Medix after the execution of the Addendum. In other words, the parties' dispute appears to be one of contract interpretation. Because contract interpretation is a matter of law, "[s]ummary judgment is a particularly appropriate mechanism for resolving" this dispute. *Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 431 F. Supp. 3d 995, 998 (N.D. Ill. 2020) (Rowland, J.) (citing *International Union of United Auto., Aerosapce and Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003)).

Under Illinois law, contracts are interpreted based on their plain language. *See Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 874 N.E.2d 43, 58 (2007). That contractual language must be read as a whole, in favor of internal harmony. *See id.*; *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (quotation omitted). Under that principle, "[t]he more specific provision of a contract governs where it arguably conflicts with a more general provision." *Aeroground, Inc. v. CenterPoint Properties Tr.*, 738 F.3d 810, 813 (7th Cir. 2013) (citing *Grevas v. U.S. Fidelity & Guar. Co.*, 152 Ill.2d 407, 411, 178 Ill.Dec. 419, 604 N.E.2d 942 (1992)).

Medix argues that the Epic PSA's definition of "Client" as "NOVO Health, LLC, … including its subsidiaries, divisions, and affiliates" applies to the Addendum as well. But the Court must begin with the contract's plain language, and Defendants are correct that the plain language

7

defining the term "Client" differs in the Epic PSA and the Addendum. The Court cannot ignore the omission of "subsidiaries, divisions, and affiliates" in the Addendum. On its face, the Addendum is between Medix and "NOVO Health, LLC" alone.

Medix notes that the Addendum and Epic PSA reference each other and argues that they must therefore be read consistently. Medix's reasoning is correct, but it reaches the wrong conclusion. For instance, Medix argues that, since the Addendum references the broader Epic PSA, the Epic PSA's definitions must control the Addendum, and that the Epic PSA's "merger" or "integration clause" shows that the Epic PSA explicitly contemplated the Addendum and thus created definitions for both. Medix suggests that Defendants' interpretation is absurd, as it would have the contract at once explicitly create a broad definition of "Client" and implicitly destroy it.

But in all these arguments, Medix misses a crucial point. The Epic PSA sets up a broad relationship between the companies for Medix's various types of staffing services, explicitly providing a non-exhaustive list of services Medix *can* provide. The Addendum, in contrast, addresses a specific type of employee and specific type of service Medix *will* provide: "Medix agrees to provide Client with qualified Medix employees ("Contractors") for Client's Epic software transition project."

The distinction in the definitions of "Client" makes sense under a complete reading of the contract—Novo Health and its subsidiaries, divisions, and affiliates are the "Client" that contracted for general staffing services under the Epic PSA; one of those entities (Novo Health) contracted for "qualified Medix employees [] for [its] Epic software transition project" under the Addendum. This distinction is further illustrated by the parties' decision to keep Medix's "Alidade Group division" listed under the Addendum while omitting Novo Health's subsidiaries, divisions, and affiliates. That language shows that the contract is not meant to refer to Medix and Novo Health's subsidiaries

8

implicitly. The plain language of the contract, read in context of the entire agreement, means that only Novo Health is liable for the costs of the services rendered under the Addendum.

As explained above, the parties agree the contract between them was breached, their only dispute is whether the entities other than Novo Health are liable. Medix puts very few facts before the Court about the services it provided to Defendants. *See* Dkt. 51 ¶ 9 (Medix "is the only employee staffing company which Defendants have used."); *id.* ¶ 10 ("Defendants engaged with [Medix] because Defendants lacked the expertise in hiring Epic Systems Corporation ("Epic") trained personnel."). On that thin record, Medix only identifies services rendered under the Addendum, that is, services for the Epic software transition project. Medix has only shown that Novo Health breached its contract with Medix. It has not shown, under its burden at summary judgment, that the services at issue include any services rendered under the broader Epic PSA but separate from those rendered under the Addendum. The Court therefore grants Medix's motion for summary judgment on Count I as to Novo Health only and denies Medix's motion for summary judgment against the other entities. Because Defendants have not moved for summary judgment, and because Medix could still prove at trial that it rendered services under the Epic PSA, the Court denies Defendants' request for summary judgment under Rule 56(f)(1). *See Tatum*, 2022 WL 16844705, at *2 n.2 (explaining that courts are not required to grant summary judgment under Rule 56(f)(1)).

    2. *Account Stated*

An "account stated" under Illinois law is "an agreement between parties who have had previous transactions that the account representing those transactions is true and that the balance stated is correct, together with a promise, express or implied, for the payment of such balance." *Brad Foot Gear Works, Inc. v. Delta Brands, Inc.*, 332 F. Supp. 2d 1123, 1125 (N.D. Ill. 2004) (Moran, J.) (quoting *W.E. Erickson Const., Inc. v. Congress–Kenilworth Corp.*, 132 Ill. App. 3d 260, 267, 87 Ill.Dec.

9

536, 477 N.E.2d 513, 519 (1st Dist. 1985)). But an "account stated" claim is related to a contract claim. It only determines the amount of a debt where liability already exists, it does not create a new liability on its own. *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Grp., Inc.*, 218 F. Supp. 2d 974, 979 (N.D. Ill. 2002) (Shadur, J.) (quoting *Dreyer Med. Clinic, S.C. v. Corral*, 227 Ill.App.3d 221, 226, 169 Ill.Dec. 231, 591 N.E.2d 111, 114 (2d Dist. 1992)). In other words, a party that recovers damages for breach of contract "may not also recover the same damages under the theory of account stated." *Id.* The Court has already found in Medix's favor on its breach of contract claim for the entire amount owed. Therefore, the Court dismisses Count II as moot.

    3. *Piercing the Corporate Veil*

        a. Choice of Law

The parties dispute whether Illinois or Wisconsin law applies to Medix's attempt to pierce the corporate veil. They do not dispute that, upon initial review, Wisconsin law should apply, as the corporate defendants are Wisconsin companies and "Illinois applies the law of the state of incorporation for veil piercing claims." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) (citations omitted). Instead, Medix contends that Defendants waived their choice-of-law argument because they applied Illinois law in their motion to dismiss argument against Medix's veil piercing claims.

Parties can waive choice-of-law arguments, though typically "only in narrow circumstances, such as when the party has 'explicitly submitted' to the law of the forum state or has 'unduly delayed' in raising the issue." *Johnson v. Diakon Logistics*, No. 16-CV-06776, 2021 WL 4477893, at *3 (N.D. Ill. Sept. 30, 2021) (Wood, J.), *rev'd on other grounds*, 44 F.4th 1048 (7th Cir. 2022). The case law on choice-of-law waiver does not provide clear rules. The *Johnson* trial court, however, provided a helpful framework, and its "reasoning [on choice-of-law waiver] persuade[d] [the Seventh Circuit]." 44 F.4th at 1052. It persuades this Court too. Specifically, the *Johnson* court explained that "Courts

10

… ordinarily find waiver only when the choice-of-law issue is first raised at a late stage in the proceedings and after the party has seemingly exhausted other arguments in their favor." 2021 WL 4477893, at *4 (collecting cases finding waiver). "In contrast, courts often find simply failing to raise a choice-of-law argument in the pleadings, alone, insufficient to constitute waiver." *Id.* (collecting cases not finding waiver).

This case falls in the latter of the two categories described above. Defendants only submission to Illinois veil-piercing law was in its motion to dismiss. But even there, Defendants did not engage in any choice-of-law argument or analysis, instead merely assuming Illinois law applied by citing to it in their three paragraphs of veil-piercing argument. Moreover, the Court never ruled on Defendants' motion, as Medix amended its complaint and Defendants responding by answering. This is not a case where Defendants "sought one ruling under Illinois law, lost, and now seek[] a different ruling." *Cornell v. BP Am. Inc.*, No. 14 C 2123, 2015 WL 5766931, at *4 (N.D. Ill. Sept. 30, 2015).

The Court therefore holds that Defendants did not waive their choice-of-law argument, and it will apply Wisconsin law to the veil piercing claim.

    b. Merits

Generally, Wisconsin law protects shareholders from personal liability for corporate liabilities through "the legal fiction of the corporate form." *Window Well Experts, Inc. v. Safety Well, Inc.*, 2023 WI App 54, ¶ 28, 997 N.W.2d 411 (Wis. App. 2023). This "corporate veil" is not "to be lightly disregarded," but in certain circumstances Wisconsin law allows a plaintiff to "pierc[e] the corporate veil" to hold a shareholder personally liable. *Id.* (citing *Consumer's Co-op of Walworth Cnty. v. Olsen*, 142 Wis. 2d 465, 475, 419 N.W.2d 211 (1988) (citation omitted)). To pierce the corporate veil and hold Kubiak liable, Medix must prove the following elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction

attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Consumer's Co-op.*, 419 N.W.2d 211, 217–18 (Wis. 1988). "The absence of any one of these elements prevents piercing the corporate veil." *Id.* at 218 (internal quotation omitted).

    i.   Control

Numerous questions about Kubiak's control over the corporate defendants remain. The parties dispute the role of Novo Health's Board of Managers in controlling the company. "[F]ailure to follow corporate formalities is a factor relevant to the first element" of the veil-piercing test, i.e., control. *Id.* at 218. Medix argues that the Board's meetings were nothing more than a rubber stamp, and that Kubiak had complete control over all financial and operational decisions made by the company. It points to (1) Kubiak's deposition testimony that fewer people are in charge of Novo Health's operations than the Operating Agreement or Kubiak's affidavit claim, (2) the lack of any meaningful response to, or knowledge of, Novo Health's multiple debts, (3) Novo Health's failure to pay dividends or distributions to its members, (4) Novo Health's numerous, frequently defunct subsidiaries, (5) Kubiak's control over the companies' financial decisions, and (6) Kubiak's various statements on his decision-making authority.

Defendants respond that Kubiak operates pursuant to Novo Health's Operating Agreement, which provides for a decision-making Board, among other things. Defendants argue that Kubiak could not exercise complete control over the corporate entities as the Board met frequently to direct the company, and Novo Health employed a Finance Director to assist with its book-keeping responsibilities (though Medix notes Kubiak's testimony that the Finance Director was an outside

contractor that did not have final decision-making authority). But Defendants provide no authority to support that the mere existence of a board of directors or operating agreement prevents a plaintiff from piercing a corporate veil, and the unclear record calls Novo Health's supposed decision-makers' roles into question.

Because there is very little evidence in the record on the Board members' actions, most evidence the Court is asked to evaluate comes from Kubiak's testimony. That testimony is subject to numerous reasonable interpretations. The Court cannot "make credibility determinations, weigh the evidence, or decide which inferences to draw" at this stage. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Therefore, summary judgment on the "control" element is not warranted.

      ii.  Conduct

The propriety of the Defendants' actions, including Kubiak's salary, are also unresolved by the record before the Court. Defendants correctly argue that it is not wrongful, on its own, for an employee to take a salary when his business has outstanding debts. *See W.H. Major & Sons, Inc. v. Kruger*, 124 Wis. 2d 284, 295-96, 369 N.W.2d 400 (Wis. Ct. App. 1985). But Medix argues that Kubiak inappropriately "siphoned" money from failing companies to himself. *See Consumer's Co-op.*, 419 N.W.2d at 216 ("inadequate capitalization may be a factor relevant to whether an injustice is present sufficient to justify piercing the corporate veil in a contract case."). In other words, Medix argues that Kubiak's salary was a sham. It points to the fact that (1) the corporate entities made intercompany loans in order to cover expenses, including payroll, (2) the corporate entities have no material hard assets or office space, (3) the corporate entities have accrued numerous debts with no hope of ever repaying them, and (4) that some of the entities appear to have no purpose (or employees) whatsoever. Defendants respond that Kubiak was appointed CEO pursuant to an Operating Agreement, and that he is paid for his duties as a CEO under that agreement.

Defendants also argue that Kubiak was not in charge of the book-keeping responsibilities and was not the sole member making financial decisions.

This analysis is again complicated by the limited evidence before the Court, and the importance of Kubiak's credibility. Kubiak's role between 2016 and 2018 (after he became Novo Health's CEO but before Novo Health had an Operating Agreement) is also essential, but under-developed and under-analyzed. Since the evidence of the corporate entities' corporate formalities (or lack thereof) is open to various plausible interpretations, summary judgment on the "conduct" element is also not warranted.

iii. Causation

Causation in this case is tied up with Medix's ability to prove Kubiak's control over the corporate entities and his supposed wrongdoing. Therefore, any causation determination can only be settled after the facts surrounding those issues are decided.

iv. Summary Judgment

Medix has not met its burden to show that there is no dispute of material fact on any element of their veil-piercing claim. Although the record is thin, Medix's motion for summary judgment is "not a concession that the same facts might warrant judgment against [Medix], or that [Medix] could marshal no additional evidence or arguments in opposition to the prospect of such an adverse judgment." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015). The Court therefore also denies Defendants' request for summary judgment under Rule 56(f)(1).

4. *Unjust Enrichment*

To prove unjust enrichment under Illinois law, which the parties agree applies here, Medix must show that Kubiak "unjustly retained a benefit to [Medix's] detriment, and that [Kubiak's] retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Banco Panamericano, Inc. v. City of Peoria, Illinois*, 880 F.3d 329, 333 (7th Cir. 2018) (quoting *HPI Health*

*Care Servs., Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989)). There is no dispute that Kubiak did not contract with Medix for its services. Instead, Medix argues that it conferred a benefit on Kubiak through third parties, the corporate entities, when those third parties paid Kubiak's salary with money that was supposedly owed to Medix. In such cases, "a defendant's retention of the benefit is unjust when … 'the defendant procured the benefit from the third party through some type of wrongful conduct[.]'" *Id.* (citing *HPI Health Care Servs.*, 545 N.E.2d at 679). Medix relies on the same facts discussed in Section (3)(ii) to argue Kubiak unjustly retained his salary. For the same reasons, the record is unclear about whether Kubiak's conduct was wrongful in the context of Medix's unjust enrichment claim.

Medix also fails to prove that it is entitled to Kubiak's salary. Although it is undisputed that the corporate entities made intercompany loans to cover payroll, the record is unclear on any specifics about these loans and how they may have related to money owed to Medix. Accordingly, the Court denies summary judgment on Medix's unjust enrichment claim.

**CONCLUSION**

For these reasons, the Court (1) grants Medix's motion for summary judgment on Count I only as to Novo Health and denies Medix's motion for summary judgment on Count I as to all other Defendants; (2) denies Medix's motion for summary judgment on Count II; (3) denies Medix's motion for summary judgment on its veil-piercing theory; (4) denies Medix's motion for summary judgment on Count III; and (5) denies Defendants' request for summary judgment under Rule 56(f)(1).

**IT IS SO ORDERED.**

Date: 2/13/2024

Entered:

SHARON JOHNSON COLEMAN
United States District Judge